UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GEORGE STEVENS, et al., ) | |
| ) | |
| Plaintiff(s), ) | |
| ) | |
| vs. ) | Case No. 4:10CV951 JCH |
| ) | |
| CITY OF ST. LOUIS, et al., ) | |
| ) | |
| Defendant(s). ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant Corizon, Inc.'s Motion for Summary Judgment, filed on March 9, 2012. (ECF No. 132). This matter is fully briefed and ready for disposition.

**BACKGROUND**

This is an action brought by Plaintiff George Stevens, the father of decedent Michael Stevens, and Plaintiff Helen Nickels, the personal representative of decedent Michael Stevens. (Third Amended Complaint ("Complaint"), ECF No. 60, ¶¶ 1, 2). This action arises out of the death of Stevens, who was killed by Robert Francis on April 26, 2008, when Francis strangled Stevens while the two shared a jail cell in the City of St. Louis Justice Center. (Id., ¶¶ 18, 20, 32, 38).

On April 26, 2008, both Stevens and Francis were admitted into the Justice Center. (Id., ¶ 18). The Justice Center is a correctional facility located within and operated by Defendant City of St. Louis ("City"). (Id., ¶ 18). Defendants Harry, Hall, Bond, Harrison, and Soward were all officers with Defendant City's Department of Public Safety and were employees of Defendant City. (Id., ¶¶ 8-12, 16). Defendant CMS contracts with Defendant City to provide medical and mental health care to pretrial detainees and inmates confined within Defendant City's jail facilities. (Defendant Corizon's Statement of Uncontroverted Material Facts in Support of Defendant's Motion for Summary

Judgment ("Defendant's SUMF"), ¶ 1, citing Corizon's Answer to Third Amended Complaint, ¶ 13).

### A. The Intake Assessment Process

A medical and mental health intake assessment is performed on an arrestee at the time of the arrestee's arrival at the jail. (Defendant's SUMF, ¶ 2, citing Ex. A, p. 35, lines 1-7). These assessments are referred to as the Receiving Screening and the Mental Health Screening. (See id., ¶¶ 3, 6, citing Ex. B and Ex. C). The Receiving Screening is performed by a healthcare staff member and includes inquiry into current medical health, mental health, medications, and drug and alcohol use. (Defendant's SUMF, ¶ 5, citing Ex. B, ¶ 5). The Receiving Screening also includes observations of behavior, state of consciousness, mental status, appearance, conduct, tremors, and sweating. (Id.). The Mental Health Screening includes obtaining a mental health history and current mental status of suicidal ideations, general behavior, and violent behavior. (Id., ¶ 7, citing Ex. C., ¶¶ 2, 5).

The mental health intake assessment is performed by an intake nurse. (Id., ¶ 11, citing Ex. A, pp. 39-40, lines 18-25 and 1-25). The mental health intake assessment determines whether the arrestee is "fit for confinement." (Id., ¶ 12, citing Ex. A, pp. 39-40, lines 18-25 and 1-25). An arrestee is "fit for confinement" if the facility and its staff are able to take care of the arrestee's medical and mental health needs. (Id., ¶ 13, citing Ex. A, p. 40). An arrestee who is found unfit for confinement is transferred to an emergency room. (Id., ¶ 14, citing Ex. A, pp. 40-41). If the arrestee self-reports a history of mental health issues and displays no unusual behavior, the intake nurse may obtain a release of information from the arrestee to determine his medications or other information and perform a more in-depth review at a subsequent health assessment. (Id., ¶ 15, citing Ex. A, pp. 60-62, lines 1-25, 1-25, and 1-16). The arrestee is then released to the post-admission housing ("PAH") unit. (Id.). If the nurse performing the intake assessment determines that an arrestee is a

danger to himself or others, the nurse notifies custody staff that alternative housing may be needed. (Id., ¶ 16, citing Ex. A, p. 42, lines 6-25).

If an arrestee is given a mental health referral by the intake nurse, a copy of the referral is brought to the attention of a mental health professional, and a mental health professional follows up with the arrestee on the next business day. (Plaintiffs' Statement of Material Facts ("Plaintiffs' SMF"), ECF No. 148, p. 7, ¶ 63, citing Ex. 12, p. 65, lines 9-14).[1] The correctional staff is not notified when the intake nurse recommends that an arrestee receive a mental health referral. (Id., p. 7, ¶ 64, citing Ex. 12, p. 66, lines 4-7). There is no communication from the nursing staff to the correctional staff regarding a mental health referral when the nursing staff issues one. (Id., p. 7, ¶ 65, citing Ex. 12, p. 66, lines 8-16). The only information that is transmitted to the correctional staff from the nursing staff is whether the arrestee is suicidal or requires close observation. (Id., p. 8, ¶ 72, citing Ex. 8, p. 31, lines 3-7). The correctional staff has limited communication with the nursing staff, and the correctional staff only comes into contact with the nursing staff when an arrestee is going on or off suicide watch, when a nurse is passing out medications, and when a decision is being made as to whether to remove an arrestee's clothing. (Id., p. 8, ¶ 75, citing Ex. 1, p. 26, lines 3-16).

### B.     The Intake Assessment of Stevens

Nurse Gelaine Reynolds performed the intake assessment on Stevens on April 25, 2008. (Defendant's SUMF, ¶ 21, citing Ex. E, p. 50). According to Defendant CMS, Nurse Reynolds did not observe anything unusual about the manner in which Stevens answered her questions. (Id., ¶ 23,

---

[1]The Court notes that, apparently as a result of the size of two of the exhibits to Plaintiffs' SMF (ECF No. 148), nearly all of the exhibits filed along with Plaintiffs' SMF are incorrectly identified in Plaintiffs' SMF. Thus, Exhibit 4 in Plaintiffs' SMF is actually Exhibits 4 and 5 (ECF Nos. 148-4 and 148-5), and Exhibit 5 in Plaintiffs' SMF is actually Exhibits 6 and 7 (ECF Nos. 148-6 and 148-7), which in turn changes Exhibit 6 in Plaintiffs' SMF to Exhibit 8 (ECF No. 148-8), and so on. The Court has properly designated the exhibits in its citations to the record.

citing Ex. E, pp. 50-51). Nurse Reynolds did not recall anything unusual about Stevens's general demeanor. (Id., ¶ 24, citing Ex. E, p. 51). Stevens offered no information to Nurse Reynolds about a prior mental health history. (Id., ¶ 26, citing Ex. E, p. 50). Stevens did not verbally report a mental health treatment history to Nurse Reynolds. (Id., ¶ 33, citing Ex. E, p. 57). According to Defendant CMS, Nurse Reynolds placed a check mark next to "history of mental treatment" on the Mental Health Intake Screening form based only on her personal observation that Stevens held his head down and did not make more eye contact. (Id., ¶¶ 31, 32, citing Ex. E, pp. 56-57).

According to Plaintiffs, however, Nurse Reynolds noted the word "psych" on Stevens's intake form. (Plaintiffs' SMF, p. 7, ¶ 69, citing Ex. 11, pp. 57-58, lines 21-15, 1-4, and Ex. 25). Nurse Reynolds only writes "psych" on an intake form if she feels an arrestee may need a mental health referral. (Id.). Plaintiffs assert Nurse Reynolds recommended that Stevens receive a mental health referral. (Id., p. 7, ¶ 70, citing Ex. 11, p. 58, lines 5-8, and Ex. 25). Defendant CMS disagrees, arguing that Nurse Reynolds wrote "psy?" on the mental health intake form in the event that Stevens would need a mental health referral later. (Defendant Corizon, Inc's Response to Plaintiffs' Statement of Additional Material Facts ("Defendant's Response to SAMF"), ECF No. 156, ¶ 70). Plaintiffs also assert Stevens suffered from schizophrenia and would hear voices, talk to himself, and have the shakes. (Plaintiffs' SMF, p. 4, ¶ 6, citing Ex. 27, pp. 53-54, lines 11-25, 1-5).

Plaintiffs and Defendant CMS acknowledge that the medical records indicate Stevens reported to the police department that he had no history of psychiatric or psychological problems. (Defendant's SUMF, ¶ 27, citing Ex. D, p. 1). Stevens's signature appears on the mental health intake form wherein he acknowledges answering the questions truthfully and that he was told how to access mental health services. (Id., ¶ 37, citing Ex. D, p. 3). Based on Nurse Reynolds's observations and Stevens's self-reported medical history, Nurse Reynolds recommended that Stevens

- 4 -

be placed in the general population. (Id., ¶ 30, citing Ex. E, pp. 2, 56). Nurse Reynolds had no further involvement in Stevens's care and learned of his death from others in the medical department. (Id., ¶ 38, Ex. D, pp. 1-3, and Ex. E, p. 64).

### C. The Intake Assessment of Francis

Nurse Clara Foster performed the medical intake assessment of Francis. (Id., ¶¶ 40, 42, citing Ex. F, 2, and Ex. G, 9, 48-49). Based on her intake assessment, Nurse Foster concluded that no medical referrals were needed and that Francis could be placed in the general population. (Id., ¶ 43, citing Ex. F, p. 2, and Ex. G, pp. 54-55).

Nurse Foster also completed the mental health screening of Francis. (Id., ¶ 44, citing Ex. F, p. 3). Francis responded "no" or in the negative to each question Nurse Foster asked him that appeared on the mental health screening form. (Id., ¶ 45, citing Ex. F, p. 3, and Ex. G, pp. 56-57). Francis denied thoughts of self-harm and that he had any current mental health complaints or a history of mental health or violent behavior. (Id., ¶ 46, citing Ex. F, p. 3). Nurse Foster did not observe Francis acting or speaking in a strange manner. (Id., ¶ 47, citing Ex. F, p. 3, and Ex. G, p. 60). Nurse Foster noted that Francis was alert and oriented to person, place, and time; that Francis's appearance was neat and clean; and that Francis's affect activity, mood, and speech were appropriate. (Id.). Nurse Foster concluded that Francis displayed no apparent mental health problems, and Nurse Foster recommended his placement in the general population. (Id., ¶ 49, citing Ex. F, p. 3, and Ex. G, p. 57). Francis's signature appears on the mental health intake form acknowledging that he answered the questions truthfully and was told how to access mental health services. (Id., ¶ 51, citing Ex. F, p. 3).

Nurse Foster had no further involvement with Francis after he was transferred from intake to the second floor. (Id., ¶ 52, citing Ex. G, pp. 77-78, lines 1-25 and 1-8). No correctional officer spoke to Nurse Foster about Francis. (Id., ¶ 54, citing Ex. G, p. 61, lines 11-13).

### D. Admissions Area

Officer Francisco Cruz was working in the admissions area on April 26, 2008. (Id., p. 4, ¶ 5, citing Ex. 6, p. 55, lines 4-8). It is unclear what Cruz's job duties entailed or at what point Stevens and Francis were taken to this area. Cruz described Francis as "a little agitated" that day. (Id., p. 4, ¶ 7, citing Ex. 6, p. 59, lines 1-3). Francis said a few things that "were a little off the wall," and Cruz described his language as threatening. (Id., p. 4, ¶ 8, citing Ex. 6, p. 60, lines 5-12). Cruz heard Francis make statements about cannibalism. (Id., p. 4, ¶ 9, citing Ex. 6, p. 62, line 1). Prior to Stevens's death, there was discussion among the correctional staff that Francis should be isolated. (Id., p. 4, ¶ 12, citing Ex. 7, p. 123, lines 15-18). After Stevens's death, Cruz stated Defendant Hall told him that Francis should have been separated from the other arrestees. (Id., p. 4, ¶ 13, citing Ex. 7, p. 72, lines 3-8).

### E. Post-Admission Housing

Defendant Soward acknowledged there were two "mentally retarded" men housed together when he started his shift. (Plaintiffs' SMF, p. 4, ¶ 16, citing Ex. 14, p. 7). It is unclear who made the decision to put Stevens and Francis in the same cell. Other correctional officers told Soward after the incident that Francis had been in a fight with another arrestee as he was brought over to PAH. (Id., p. 4, ¶ 14, citing Ex. 14, p. 20).

When Defendant Soward first encountered Stevens during Defendant Soward's "initial count," Stevens kept repeating the letters "MD." (Id., p. 4, ¶ 19, citing Ex. 16, p. 3). Plaintiffs do not specify what actions Defendant Soward took as part of his "initial count" or when his initial count

occurred. At some point Defendant Soward asked Stevens his name, and Stevens responded "MD." (Id., p. 4, ¶ 18, citing Ex. 5, p. 72, lines 14-16).

During recreation time, Defendant Soward observed that Stevens "didn't seem like he was there." (Id., p. 4, ¶ 17, citing Ex. 16, p. 4). An arrestee named Derrick Williams told Defendant Soward during recreation time that both Stevens and Francis were crazy. (Id., p. 4, 6, ¶¶ 4, 44, citing Ex. 24, ¶¶ 2, 6). Williams was acquainted with both Stevens and Francis. (Id., p. 6, ¶ 41, citing Ex. 24, ¶ 3). Defendant Soward was laughing at Francis's unusual behavior during recreation time and called Francis a "crazy mother fucker." (Id., p. 6, ¶¶ 45, 46, citing Ex. 24, ¶¶ 7, 8). At some point Defendant Soward used an intercom system to listen in to cell 28, and he overheard Stevens "talking out of his head." (Id., pp. 4-5, ¶¶ 21, 22, citing Ex. 3, p. 55, lines 6-9 and Ex. 16, p. 13).

**F.    The Incident**

Defendant Soward left for lunch at about 7:12 P.M. (Id., p. 5, ¶ 28, citing Ex. 6, p. 85, lines 5-9). When the officer for the male side of PAH takes a break, the officer for the female side of PAH is responsible for observing both sides of PAH. (Id., p. 9, ¶ 93, citing Ex. 26, ¶ 8). At the time that Defendant Soward left for lunch, the male side of PAH was unsupervised for a period of time. (Id., p. 5, ¶ 37, citing Ex. 3, p. 63, lines 21-24). Francis began assaulting Stevens after Defendant Soward left his station. (Id., p. 6, ¶ 48, citing Ex. 24, ¶ 10).

Defendant Hall estimated that one or two minutes elapsed from the time that Defendant Soward left the male side of PAH until she entered the male side of PAH. (Id., p. 5, ¶ 31, citing Ex. 14, p. 5). Defendant Hall heard arrestees saying "they're fighting, they're fighting in cell 28" as soon as she opened the door to the male side of PAH. (Id., p. 6, ¶ 52, citing Ex. 3, p. 64, lines 3-8). According to Plaintiffs, "the incident was called" between 7:10 P.M. and 7:20 P.M. (Id., p. 5, ¶¶ 33-

35, citing Ex. 17, Ex. 18, and Ex. 19). 911 was called at 7:25 P.M. (Id., p. 5, ¶ 36, citing Ex. 14, p. 6). The parties offer no additional information regarding when or where Stevens died.

### G.    Plaintiffs' Third Amended Complaint

Plaintiffs filed this action against Defendants City, Harry, Hall, Bond, Harrison, Soward, and CMS on April 23, 2010, in the Circuit Court of the City of St. Louis, State of Missouri. On May 25, 2010, Defendants removed the case to this Court on the basis of federal question jurisdiction. Count I[2] of Plaintiffs' Complaint alleges violation of 42 U.S.C. § 1983, in that all Defendants subjected Stevens to "cruel and unusual punishment, a deprivation of life without due process of law, a deprivation of liberty without due process of law, illegal seizure of Michael Stevens' person, and a deprivation of freedom from summary punishment all in violation of the Fourth, Fifth, Eight, and Fourteenth Amendments to the United States Constitution."[3]  (Complaint, ¶¶ 42(g), 43(g), 44(g)). With regards to Defendant CMS, Count I asserts Defendant CMS was deliberately indifferent to

---

[2]The Court notes that a section titled "Violation of 42 USC Section 1983" begins on page 7 of Plaintiffs' Third Amended Complaint. The next section of Plaintiffs' Third Amended Complaint is titled "Count II: Wrongful Death Against Defendants Soward, Hall, Harrison, Harry, Bond, and CMS" and beings on page 13. The Court presumes, therefore, that "Violation of 42 USC Section 1983" is intended to serve as Count I of Plaintiffs' Third Amended Complaint.

[3] Although Plaintiffs' Third Amended Complaint contains Eighth Amendment claims, Stevens's status as a pre-trial detainee placed him outside the protections of the Eighth Amendment proscription against cruel and unusual punishment. See Hott v. Hennepin County, Minnesota, 260 F.3d 901, 905 (8th Cir. 2001) (citation omitted). "The Fourteenth Amendment guarantees pre-trial detainees at least as many protections as does the Eighth Amendment, however, and extends to them as well protection from deprivations that are intended to punish." Id. (citations omitted).

Stevens's serious medical need.[4]  Count II of Plaintiffs' Complaint alleges wrongful death under Missouri law against Defendant CMS.

As noted previously, Defendant CMS filed its Motion for Summary Judgment on March 9, 2012. While Defendant CMS's Motion for Summary Judgment states it is directed to all of Plaintiffs' claims against it, Defendant's Motion limits its discussion of Plaintiffs' Count I claims to jurisprudence discussing failure to protect claims under the Eighth Amendment.  Accordingly, with regards to Count I, the Court will read Defendant CMS's Motion as applying to Plaintiffs' failure to protect claim under the Eighth Amendment.

## **STANDARD**

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The substantive law determines which facts are critical and which are irrelevant.  Only disputes over facts that might affect the outcome will properly preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.

---

[4]The Court finds Plaintiffs' Third Amended Complaint unclear as to what cause of action Plaintiffs are asserting against Defendant CMS under Count I.  Since Defendant CMS has interpreted Plaintiffs' Third Amended Complaint to allege Defendant CMS was deliberately indifferent to Stevens's serious medical need, and since Plaintiffs have conceded this interpretation in their Memorandum in Opposition to Defendant CMS's Motion for Summary Judgment ("Memo in Opposition," ECF No. 144), the Court will read Count I of Plaintiffs' Third Amended Complaint as alleging that Defendant CMS was deliberately indifferent to Stevens's serious medical need.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." FED. R. CIV. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Id. at 249.

## DISCUSSION

### I. Count I: Eighth Amendment

As stated above, Count I of Plaintiffs' Third Amended Complaint alleges Defendant CMS was deliberately indifferent to Stevens's serious medical need. Defendant argues Plaintiff has not demonstrated that CMS maintained any unconstitutional customs, practices, or policies to hold it liable under 42 U.S.C. § 1983. Plaintiff counters that there is evidence of two unconstitutional customs: the failure to provide arrestees with adequate medical services when ordering a mental health referral, and the inadequacy of communication between the nursing staff and the correctional staff.

As an initial matter, a corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies. Sanders v. Sears, Roebuck & Co., 984 F.2d 972, 975-76 (8th Cir. 1993) (citing Monell v. Dep't of Social Services, 436 U.S. 658, 690 (1978)). The proper

test is whether there is a policy, custom, or action by those who represent official policy that inflicts injury actionable under § 1983. Id.

The Eighth Circuit has held that "[t]he Eighth Amendment requires prison officials to provide humane conditions of confinement, and [o]ne condition of confinement is the medical attention given to a prisoner." Aswegan v. Henry, 49 F.3d 461, 463-64 (8th Cir. 1995) (internal quotations and citations omitted). "To succeed on a claim of deprivation of medical care in violation of the Eighth Amendment, plaintiff must prove that defendants were deliberately indifferent to his serious medical needs." Moots v. Lombardi, No. 4:02CV1886, 2005 WL 4541944, at *5 (E.D. Mo. Feb. 10, 2005) (citing Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997)).

> There is both an objective and subjective component to a claim of deliberate indifference. A plaintiff must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.

Tlamka v. Serrell, 244 F.3d 628, 633 (8th Cir. 2001) (internal quotations and citation omitted). A prison official acts with the requisite deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Mere negligence or medical malpractice is insufficient to rise to a constitutional violation. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997).

As indicated previously, the Eighth Amendment's proscription against cruel and unusual punishment applies only to convicted prisoners and not pre-trial detainees. Hott, 260 F.3d at 905. The Fourteenth Amendment guarantees pre-trial detainees at least as many protections as does the Eighth Amendment, however, and extends to them as well protection from deprivations that are intended to punish. Id. (citing Bell v. Wolfish, 441 U.S. 520, 545 (1979)).

Viewing the facts in the light most favorable to Plaintiffs, Defendant CMS is not entitled to judgment as a matter of law on Plaintiffs' claim for deliberate indifference to serious medical need. Defendant CMS's sole argument is that Plaintiffs have not shown that Defendant CMS maintained any unconstitutional customs, practices, or policies.[5] The Court finds there is a genuine issue of material fact as to Defendant CMS's exact procedures regarding ordering a mental health referral, given the parties' disagreement as to whether Nurse Reynolds ordered a mental health referral and the ambiguity of the notations on Stevens's mental health intake form. Additionally, both Stevens and Francis exhibited behavior during their incarceration that calls the accuracy and sufficiency of their initial mental health assessments into question. Finally, Plaintiffs have presented evidence that it was the custom of Defendant CMS to not communicate mental health concerns to the correctional officers working at the Justice Center. A reasonable jury could find that Defendant CMS's customs and policies resulted in deliberate indifference to the serious medical need of Stevens and would have had a similar effect on another mentally ill arrestee in his situation. Defendant CMS's Motion for Summary Judgment as to Count I is denied.

## II.     **Count II: Wrongful Death**

Count II of Plaintiffs' Third Amended Complaint alleges wrongful death against Defendant CMS under Missouri law. Defendant CMS argues Plaintiffs have not shown that any alleged breach

---

[5]Defendant CMS argues Plaintiffs are raising "new claims related to medical" in their Memo in Opposition that Plaintiffs have not previous pled. (Defendant Corizon, Inc's Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Defendant's Reply"), ECF No. 157, pp. 1-2). Defendant CMS does not specify what "new claims related to medical" Plaintiffs have raised. Plaintiffs' Third Amended Complaint alleges "Defendants City, Bond, Harrison and CMS knowingly instituted and/or allowed an official practice, policy and custom of failing to properly gather information regarding arrestees and/or failing to utilize said information to properly segregate arrestees so as to prevent serious risks of substantial harm." (Complaint, ¶ 42(a)). The Court finds that both customs or policies raised by Plaintiffs in their Memo in Opposition fall under this allegation.

of duty by Defendant CMS was the proximate cause of Stevens's death.[6]  Plaintiffs counter that Defendant CMS's failure to diagnose Stevens or communicate his mental health condition to the correctional officers resulted in Stevens's placement in a cell with Francis, which proximately caused Stevens's death.

Under Missouri law, Plaintiffs must establish the following elements in order to succeed on wrongful death claim on a theory of negligence: (1) the defendant owed a duty of care to the decedent; (2) the defendant breached that duty; (3) the breach was the cause in fact and the proximate cause of his death; and (4) as a result of the breach, the plaintiff suffered damages.  Heffernan v. Reinhold, 73 S.W.3d 659, 665 (Mo. App. 2002).

"Proximate cause is not causation in fact, but is a limitation the law imposes upon the right to recover for the consequences of a negligent act."  Robinson v. Missouri State Highway and Transp. Com'n, 24 S.W.3d 67, 77 (Mo. App. 2000) (citing Simonian v. Gevers Heating & Air Conditioning, Inc., 957 S.W.2d 472, 475 (Mo. App. 1997)).  "The requirement of proving proximate cause absolves those actors whom it would be 'unfair' to punish because of the attenuated relation which their conduct bears to the plaintiff's injury."  Id. at 77-78.  As noted by the Missouri Supreme Court,

> Proximate cause requires something in addition to a "but for" causation test because the "but for" causation test serves only to exclude items that are not causal in fact; it will include items that are causal in fact but that would be unreasonable to base liability upon because they are too far removed from the ultimate injury or damage.

---

[6]Although the heading to Section III of Defendant CMS's Memorandum of Law in Support of Their [sic] Motion for Summary Judgment ("Memo in Support," ECF No. 133, p. 4) also claims "Plaintiff cannot prove that Corizon breaches [sic] its duty to Michael Stevens," the body of Section III contains no analysis or mention of this argument.  Plaintiffs do not address the argument that Defendant CMS did not breach any alleged duty owed to Stevens, and the Court also declines to address this argument.

State ex rel. Missouri Highway and Transp. Comm'n v. Dierker, 961 S.W.2d 58, 60 (Mo. banc 1998) (quoting Callahan v. Cardinal Glennon Hosp., 863 S.W.2d 852, 865 (Mo. banc 1993)).

The general test for proximate cause is "whether an injury is the natural and probable consequence of the defendant's negligence." Stanley v. City of Independence, 995 S.W.2d 485, 488 (Mo. banc 1999). This is determined by looking back, after the occurrence, and examining whether the injury appears to be a reasonable and probable consequence of the conduct. Jones v. Trittler, 983 S.W.2d 165, 168 (Mo. App. 1998). "'[F]rom the essential meaning of proximate cause arises the principle that in order for an act to constitute the proximate cause of an injury, some injury, if not the precise one in question, must have been reasonably foreseeable.'" Hansen v. James, 847 S.W.2d 476, 481 (Mo. App. 1992) (quoting Krause v. U.S. Truck Co., 787 S.W.2d 708, 710 (Mo. banc 1990)) (citations omitted). "Foreseeability is not a matter of mathematical certainty. No event is entirely foreseeable." Shannon v. Wal–Mart Stores, Inc., 974 S.W.2d 588, 591 (Mo. App. 1998). As such, the test for proximate cause "is not whether a reasonably prudent person would have foreseen the particular injury, but whether, after the occurrences, the injury appears to be the reasonable and probable consequence of the act or omission of the defendant." Simonian, 957 S.W.2d at 475. "It is only necessary that the party charged knew or should have known there was an appreciable chance some injury would result." Jones, 983 S.W.2d at 168.

Viewing the facts in the light most favorable to Plaintiffs, Defendant CMS is not entitled to judgment as a matter of law as to Plaintiffs' wrongful death claim. A defendant is not excused from liability when the chain of causation includes a criminal act. Finocchio v. Mahler, 37 S.W.3d 300, 303 (Mo. App. 2000). Rather, the location of the criminal act contributes to the determination of whether the intervening criminal act is foreseeable. See Virgina D. v. Madesco Inv. Corp., 648 S.W.2d 881, 887 (Mo. banc 1983) ("Any suggestion that crime is not foreseeable is particularly

inappropriate when a downtown metropolitan area is involved, especially when the case involves a hotel."). Crime or violence is readily foreseeable in a city jail, and an arrestee with a mental illness is likely at an increased risk of victimization. A jury could find that Stevens's death was a reasonable and probable consequence of Defendant CMS's failure to properly screen Stevens for mental illness and communicate his condition to correctional officers. Defendant CMS's Motion for Summary Judgment as to Count II is denied.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Corizon, Inc.'s Motion for Summary Judgment (ECF No. 132) is **DENIED**.

Dated this   25th   day of May, 2012.

                                                                  /s/ Jean C. Hamilton
                                                        UNITED STATES DISTRICT JUDGE