UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GEORGE STEVENS, et al.,                )
                                       )
          Plaintiff(s),                )
                                       )
     vs.                               )          Case No. 4:10CV951 JCH
                                       )
CITY OF ST. LOUIS, et al.,             )
                                       )
          Defendant(s).                )

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants City of St. Louis, Tonya Harry, Patricia Hall, Robert Bond, Carla Harrison, and Louis Soward's Motion for Summary Judgment, filed on March 9, 2012.  (ECF No. 135).  This matter is fully briefed and ready for disposition.

## BACKGROUND

This is an action brought by Plaintiff George Stevens, the father of decedent Michael Stevens, and Plaintiff Helen Nickels, the personal representative of decedent Michael Stevens.  (Third Amended Complaint ("Complaint"), ECF No. 60, ¶¶ 1, 2).  This action arises out of the death of Stevens, who was killed by Robert Francis on April 26, 2008, when Francis strangled Stevens while both men shared a jail cell in the City of St. Louis Justice Center.  (Id., ¶¶ 18, 20, 32, 38).

On April 26, 2008, both Stevens and Francis were admitted into the Justice Center.  (Id., ¶ 18).  The Justice Center is a correctional facility located in and operated by Defendant City of St. Louis ("City").  (Id., ¶ 18).  Defendants Harry, Hall, Bond, Harrison, and Soward were all officers with Defendant City's Department of Public Safety and were employees of Defendant City.  (Id., ¶¶ 8-12, 16).  Pursuant to a contract with Defendant City, Defendant Correctional Medical Services,

Inc., ("CMS") provided mental health care and arrestee management services at the Justice Center. (Id., ¶ 13(a)).

At the time of the incident, Defendant Harry was a correctional shift supervisor with the rank of Captain.  (Defendants' Statement of Uncontroverted Facts ("Defendants' SUF"), ECF No. 136, ¶ 69, citing Ex. E, ¶ 1).  Defendant Harry was responsible for the admissions area of the jail at that time.  (Complaint, ¶ 8).  Defendant Harry was not working on the day of the incident. (Defendants' SUF, ¶ 70, citing Ex. E, ¶ 3).

At the time of the incident, Defendant Bond was the shift commander.  (Complaint, ¶ 10). Defendant Bond had the rank of Captain.  (Defendants' SUF, ¶ 49, citing Ex. C, p. 3).  Defendant Bond's job duties at that time involved the supervision of the entire Justice Center.  (Id., ¶ 51, citing Ex. C, ¶ 5).

At the time of the incident, Defendant Harrison was the supervisor in control of post-admissions housing ("PAH").  (Complaint, ¶ 12).  Defendant Harrison had the rank of Lieutenant. (Defendants' SUF, ¶ 59, citing Ex. D, ¶ 3).  Defendant Harrison's job duties at that time involved the supervision of correctional officers who had the primary responsibility of direct supervision of the residents housed in PAH.  (Id., ¶ 61, citing Ex. D, ¶ 5).

At the time of the incident, Defendant Hall was a correctional officer responsible for observing the female portion of PAH, and Defendant Soward was a correctional officer responsible for observing the male portion of PAH.  (Complaint, ¶¶ 9, 11).

### A.      CMS Nursing Staff

At some point after their initial arrival at the Justice Center, arrestees are evaluated by nursing staff from CMS.  At the time that an inmate presents to the CMS nursing staff, an intake nurse completes, at a minimum, two screening forms: a medical screening form and a mental health

screening form. (Plaintiffs' Statement of Material Facts ("Plaintiffs' SMF"), p. 13, ¶¶ 138, 139, citing Ex. 12, pp. 56, 109, lines 20-23, 15-18).[1]  If an arrestee is given a mental health referral, a copy of the referral would be brought to the attention of a mental health professional, and a mental health professional would follow up with the arrestee on the next business day.  (Id., p. 13, ¶ 140, citing Ex. 12, p. 65, lines 9-14).  The correctional staff is not notified when the intake nurse has recommended that an arrestee receive a mental health referral.  (Id., p. 13, ¶ 141, citing Ex. 12, p. 66, lines 4-7). There is no communication from the nursing staff to the correctional staff regarding a mental health referral when the nursing staff issues one.  (Id., p. 13, ¶ 142, citing Ex. 12, p. 66, lines 8-16).  The only information that is transmitted to the correctional staff from the nursing staff is whether the arrestee is suicidal or requires close observation.  (Id., p. 13, ¶ 149, citing Ex. 8, p. 31, lines 3-7). The correctional staff has limited communication with the nursing staff, and the correctional staff would only come into contact with the nursing staff when an arrestee is going on or off suicide watch, when a nurse is passing out medications, and when a decision is being made as to whether to remove an arrestee's clothing.  (Id., p. 14, ¶ 152, citing Ex. 1, p. 26, lines 3-16).

Both Stevens and Francis received their initial screening from CMS on April 25, 2008.  (Id., p. 14, ¶ 161, citing Ex. 25 and Ex. 27).  Stevens received his initial screening from CMS at 2:35 A.M., and Francis received his initial screening from CMS at 6:20 P.M.  (Id., p. 14, ¶ 162, citing Ex. 11, p. 29, lines 21-24; Ex. 25; and CMS Ex. F).  According to Plaintiffs, both Stevens and Francis reported to a CMS employee and/or Defendant Harry that they had mental health conditions.  (Complaint, ¶

---

[1]The Court notes that, apparently as a result of the size of two of the exhibits to Plaintiffs' SMF (ECF No. 147), nearly all of the exhibits filed along with Plaintiffs' SMF are incorrectly identified in Plaintiffs' SMF.  Thus, Exhibit 4 in Plaintiffs' SMF is actually Exhibits 4 and 5 (ECF Nos. 147-4 and 147-5), and Exhibit 5 in Plaintiffs' SMF is actually Exhibits 6 and 7 (ECF Nos. 147-6 and 147-7), which in turn changes Exhibit 6 in Plaintiffs' SMF to Exhibit 8 (ECF No. 147-8), and so on.  The Court has properly designated the exhibits in its citations to the record.

20).  Plaintiffs assert Stevens suffered from schizophrenia and would hear voices.  (Plaintiffs' SMF, p. 5, ¶ 6, citing Ex. 27, pp. 53-54, lines 11-25 and 1-5).  When Stevens presented to the CMS nursing staff, Nurse Reynolds noted that he had a history of mental health treatment and possible developmental or cognitive delay.  (Id., p. 13, ¶ 145, citing Ex. 11, p. 56, lines 21-24, and Ex. 25).  Reynolds noted the word "psych" on Stevens's intake form and recommended that Stevens receive a mental health referral.  (Id., p. 13, ¶¶ 146, 147, citing Ex. 11, pp. 57-58, lines 21-25 and 1-8, and Ex. 25).

### B.    Admissions Area

Officer Francisco Cruz was working in the admissions area on April 26, 2008.  (Id., p. 5, ¶ 5, citing Ex. 6, p. 55, lines 4-8).  It is unclear what Cruz's job duties entailed or at what point Stevens and Francis were taken to this area.  Cruz described Francis as "a little agitated" that day.  (Id., p. 5, ¶ 7, citing Ex. 6, p. 59, lines 1-3).  Francis said a few things that "were a little off the wall," and Cruz described his language as threatening.  (Id., p. 5, ¶ 8, citing Ex. 6, p. 60, lines 5-12).  Cruz heard Francis make statements about cannibalism.  (Id., p. 5, ¶ 9, citing Ex. 6, p. 62, line 1).  Prior to Stevens's death, there was discussion among the correctional staff that Francis should be isolated.  (Id., p. 5, ¶ 12, citing Ex. 7, p. 123, lines 15-18).  After Stevens's death, Cruz stated Defendant Hall told him that Francis should have been separated from the other inmates.  (Id., p. 5, ¶ 13, citing Ex. 7, p. 72, lines 3-8).

### C.    Post-Admission Housing

There is no City policy regulating cell assignments in PAH.  (Id., p. 8, ¶ 54, citing Ex. 9, p. 68, lines 8-9).  The PAH officer determines where to house the arrestees in PAH.  (Id., p. 9, ¶ 81, citing Ex. 2, p. 74, lines 8-10).  A PAH officer also has the ability to move arrestees into different cells.  (Id., p. 10, ¶ 82, citing Ex. 5, pp. 114-15, lines 24-25 and line 1).  It is the custom of the Justice

Center to put homeless arrestees in a single cell by themselves.  (Id., p. 10, ¶ 87, citing Ex. 3, p. 80, lines 15-22).

The day of the incident, Defendant Soward had been assigned the second shift in the male portion of PAH, and his work hours were 2:30 P.M. to 11:00 P.M.  (Defendants' SUF, ¶¶ 5, 6, citing Ex. A, ¶ 1, 3).  Defendant Hall had been assigned the second shift that day in the female portion of PAH, and her work hours were 2:30 P.M. to 11:00 P.M.  (Id., ¶¶ 25, 26, citing Ex. B, ¶¶ 1, 3). When Defendant Soward started his shift, Stevens and Francis were already housed together in cell 28.  (Id., ¶ 8, citing Ex. A, ¶ 5).  It is unclear who made the decision to put Stevens and Francis in the same cell.  Defendant Soward acknowledged there were two "mentally retarded" men housed together when he started his shift.  (Plaintiffs' SMF, p. 6, ¶ 16, citing Ex. 14, p. 7).  Other correctional officers told Soward after the incident that Francis had been in a fight with another inmate as he was brought over to PAH.  (Id., p. 6, ¶ 14, citing Ex. 14, p. 20).

When Defendant Soward first encountered Stevens during Defendant Soward's "initial count," Stevens kept repeating the letters "MD."  (Id., p. 6, ¶ 19, citing Ex. 16, p. 3). Plaintiffs do not specify what actions Defendant Soward took as part of his "initial count" or when his initial count occurred. At some point Defendant Soward asked Stevens his name, and Stevens responded "MD." (Id., p. 6, ¶ 18, citing Ex. 5, p. 72, lines 14-16).

During recreation time, Defendant Soward noticed Francis going into trash cans and believed Francis was homeless.  (Id., p. 6, ¶¶ 26-27, citing Ex. 5, p. 82, lines 2-5, 17-20).  It is unclear when recreation time occurred that day.  At that time, Defendant Soward also observed that Stevens "didn't seem like he was there."  (Id., p. 6, ¶ 17, citing Ex. 16, p. 4).  An inmate named Derrick Williams told Defendant Soward during recreation time that both Stevens and Francis were crazy.  (Id., p. 5, ¶ 4 and p. 7, ¶ 44, citing Ex. 24, ¶¶ 2, 6).  Williams was acquainted with both Stevens and Francis.  (Id.,

p. 7, ¶ 41, citing Ex. 24, ¶ 3).  Defendant Soward was laughing at Francis's unusual behavior during recreation time and called Francis a "crazy mother fucker."  (Id., p. 7, ¶¶ 45, 46, citing Ex. 24, ¶¶ 7, 8).  Williams previously told Soward not to put Stevens in a cell with Francis because Francis would hurt Stevens. (Id., p. 7, ¶ 43, citing Ex. 24, ¶ 5).

At some point Defendant Soward instructed workers to take trays of food to each cell.  (Id., p. 6, ¶ 23, citing Ex. 16, p. 5).  The "workers" were other inmates.  (Id., p. 6, ¶ 23, citing Ex. 16, p. 5).  Some inmates threw food at cell 28.  (Id., p. 6, ¶ 24, citing Ex. 16, p. 6).  It is unclear how many inmates were throwing food and if the inmates throwing food were in cells or were the "workers" delivering food.  At some point Defendant Soward used an intercom system to listen in to cell 28, and he overheard Stevens "talking out of his head."  (Id., p. 6, ¶¶ 21, 22, citing Ex. 3, p. 55, lines 6-9 and Ex. 16, p. 13).

### D.    The Incident

Defendant Soward left for lunch at about 7:12 P.M.  (Id., p. 6, ¶ 28, citing Ex. 6, p. 85, lines 5-9).  It is customary for the female officer on the female's side of PAH to relieve the male officer on the male's side of PAH.  (Id., p. 11, ¶ 106, citing Ex. 14, p. 9).  When this occurs, the female officer giving the male officer his break opens the door between the male and female sides of PAH to go back and forth to each side and make rounds.  (Id., p. 11, ¶ 107, citing Ex. 1, p. 31, lines 8-14 and Ex. 4, p. 35, lines 9-11).  This breaking policy started because of staff shortages.  (Id., p. 11, ¶ 108, citing Ex. 1, p. 32, lines 1-7).  Defendants Bond and Harrison were unaware of how this policy began, and both stated this policy had been in place since they started working at the Justice Center.  (Id., pp. 11-12, ¶¶ 110, 111, 115, 116, citing Ex. 2, p. 53, lines 8-15, and Ex. 8, p. 6, lines 5-8).

At the time that Defendant Soward left for lunch, the male side of PAH was unsupervised for a period of time.  (Id., p. 7, ¶ 37, citing Ex. 3, p. 63, lines 21-24).  Francis began assaulting Stevens

after Defendant Soward left his station.  (Id., p. 7, ¶ 48, citing Ex. 24, ¶ 10).  Williams and other arrestees started kicking the cell door in an attempt to draw the attention of the guards.  (Id., p. 7, ¶ 49, citing Ex. 24, ¶ 11).  Williams pressed the intercom button to alert a guard to the assault but received no response since there was no guard located at the station.  (Id., p. 7, ¶ 51, citing Ex. 24, ¶ 13).

After Defendant Soward left PAH, Nurse Laura Kases came to the female side of PAH to conduct a medication pass for both male and female detainees.  (Defendants' SUF, ¶ 32, citing Ex. B, ¶ 9).  Defendant Hall asked Nurse Kases if they could conduct the medication pass for the male detainees first, and Nurse Kases agreed.  (Id.).  Defendant Hall estimated that one or two minutes elapsed from the time that Defendant Soward left the male side of PAH until she entered the male side of PAH.  (Plaintiffs' SMF, p. 6, ¶ 31, citing Ex. 14, p. 5).  When Defendant Hall and Nurse Kases arrived on the male side of PAH, Defendant Hall heard the detainees yelling that there was an altercation occurring in cell 28.  (Defendants' SUF, ¶ 33, citing Ex. B, ¶ 10).  Nurse Kases remained at the podium area, and Defendant Hall went up the stairs to cell 28.  (Id., ¶ 34).  Defendant Hall observed one male resident lying on the floor in cell 28 and the other male resident lying on the bunk.  (Id.).  After banging on the door to cell 28 and receiving no response, Defendant Hall called Defendant Harrison on her radio to request assistance.  (Id.).  Defendant Hall was unarmed at this time, and pursuant to Justice Center protocol, a correctional officer has to wait for another correctional officer to arrive before entering a two-man cell.  (Id., ¶¶ 35, 36, citing Ex. B, ¶¶ 12, 13).  Defendant Hall returned to the podium.  (Id., ¶ 34, citing Ex. B, ¶ 11).

At the time of the incident, Defendant Harrison was signing releases for the St. Louis County police department and dealing with a situation involving a combative female resident in the medical unit.  (Id., ¶ 59, citing Ex. D, ¶ 3).  Defendant Harrison became aware of the incident when she

received the radio call from Defendant Hall.  (Id., ¶ 59, citing Ex. D, ¶ 3).  Defendant Harrison was never made aware of any health or mental condition concerning Stevens or Francis prior to the incident.  (Id., ¶ 62, citing Ex. D, ¶ 10).

 At the time of the incident, Defendant Bond was in the shift commander's office.  (Id., ¶ 49, citing Ex. C, ¶ 3).  Defendant Bond became aware of the incident when he overheard the radio call from Defendant Hall to Defendant Harrison.  (Id., ¶ 49, citing Ex. C, ¶ 3).  Defendant Bond placed a call to the podium on the male side of PAH shortly after Defendant Hall called Defendant Harrison, and Defendant Hall explained the situation to Defendant Bond.  (Id.).  Defendant Bond stated he would be on his way to the male side of PAH.  (Id.).  Defendant Bond gained knowledge of the assault on Stevens at around 7:17 P.M.  (Plaintiffs' SMF, p. 7, ¶ 32, citing Ex. 2, p. 54, lines 20-23).  Defendant Bond was never made aware of any health or mental condition concerning Stevens or Francis prior to the incident.  (Defendants' SUF, ¶ 52, citing Ex. C, ¶ 10).

When Defendant Bond arrived at the male side of PAH, he went to cell 28 with Defendant Hall and Nurse Kases.  (Id., ¶ 38, citing Ex. B, ¶ 16).  Defendant Hall unlocked the cell door, and Defendant Bond went inside, handcuffed Francis, and escorted Francis out of the cell.  (Id.).  Nurse Kases went into the cell and advised Defendant Hall that a 911 call needed to be made, and Defendant Hall called 911.  (Id.).  The 911 call was made at 7:25 P.M.  (Plaintiffs' SMF, p. 7, ¶ 36, citing Ex. 14, p. 6).  Additional nurses arrived with "equipment" and went to cell 28.  (Defendants' SUF, ¶ 38, citing Ex. B, ¶ 16).  It is unclear who began efforts to resuscitate Stevens, when these efforts began, or what equipment may have been employed to do so.  Defendant Harrison arrived at the male side of PAH after Defendant Bond and the medical staff nurses.  (Id., ¶ 60, citing Ex. D, ¶ 4).

City of St. Louis Emergency Medical Services arrived in response to the 911 call.  (Id., ¶ 40, citing Ex. B, ¶ 18).  Stevens was taken to a hospital and pronounced dead.  (Complaint, ¶ 38).

###### E.     Plaintiffs' Third Amended Complaint[2]

Plaintiffs filed this action against Defendants City, Harry, Hall, Bond, Harrison, Soward, and CMS on April 23, 2010, in the Circuit Court of the City of St. Louis, State of Missouri.  Plaintiffs brought suit against the individual defendants in both their official and individual capacities.  On May 25, 2010, Defendants removed the case to this Court on the basis of federal question jurisdiction. Count I[3] of Plaintiffs' Third Amended Complaint alleges violation of 42 U.S.C. § 1983, in that all defendants subjected Stevens to "cruel and unusual punishment, a deprivation of life without due process of law, a deprivation of liberty without due process of law, illegal seizure of Michael Stevens' person, and a deprivation of freedom from summary punishment all in violation of the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution."[4]  (Id., ¶¶ 42(g), 43(g), 44(g)).  Count I asserts all defendants failed to protect Stevens from attack by a fellow resident and were deliberately indifferent to Stevens's medical needs.[5]  Count II of Plaintiffs' Third Amended

---

[2]The Court recognizes that Count I of Plaintiffs' Third Amended Complaint is brought by Plaintiff Helen Nickels and that Count II of Plaintiffs' Third Amended Complaint is brought by Plaintiff George Stevens.  For purposes of efficiency, the Court will refer to "Plaintiffs' claims" under Count I and Count II instead of delineating "Plaintiff Helen Nickels's claims" or "Plaintiff George Stevens's claims."

[3]The Court notes that a section titled "Violation of 42 USC Section 1983" begins on page 7 of Plaintiffs' Third Amended Complaint.  The next section of Plaintiffs' Third Amended Complaint is titled "Count II: Wrongful Death Against Defendants Soward, Hall, Harrison, Harry, Bond, and CMS" and begins on page 13.  The Court presumes, therefore, that "Violation of 42 USC Section 1983" is intended to serve as Count I of Plaintiffs' Third Amended Complaint.

[4] Although Plaintiffs' Third Amended Complaint contains Eighth Amendment claims, Stevens's status as a pre-trial detainee placed him outside the protections of the Eighth Amendment proscription against cruel and unusual punishment.  See Hott v. Hennepin County, Minnesota, 260 F.3d 901, 905 (8th Cir. 2001) (citation omitted).  "The Fourteenth Amendment guarantees pre-trial detainees at least as many protections as does the Eighth Amendment, however, and extends to them as well protection from deprivations that are intended to punish." Id. (citations omitted).

[5]To the extent Defendants contend Plaintiffs' Third Amended Complaint asserts separate claims for "failure to adequately gather information," "failure to properly monitor and supervise

Complaint alleges wrongful death under Missouri law against Defendants Harry, Hall, Bond, Harrison, Soward, and CMS.

As noted previously, Defendants City, Harry, Hall, Bond, Harrison, and Soward filed their Motion for Summary Judgment on March 9, 2012.  While Defendants' Motion for Summary Judgment appears to be directed to all of Plaintiffs' claims against Defendants in Count I and Count II, Defendants' Motion limits its discussion of Plaintiffs' Count I claims to Eighth Amendment jurisprudence.  Accordingly, the Court will read Defendants' Motion as applying to Plaintiffs' Eighth Amendment claims in Count I.

## **STANDARD**

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The substantive law determines which facts are critical and which are irrelevant.  Only disputes over facts that might affect the outcome will properly preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.

A moving party always bears the burden of informing the Court of the basis of its motion.  Celotex, 477 U.S. at 323.  Once the moving party discharges this burden, the nonmoving party must

---

detainees," and "deficient training," the Court disagrees.  (See Defendants' Motion for Summary Judgment, ECF No. 135, pp. 3-5).  Plaintiffs' Memorandum in Opposition fails to offer arguments as to why these three purported claims should not be dismissed and, under the portion addressed to Defendants' arguments as to Plaintiffs' Count I claims, focuses solely on Plaintiffs' failure to protect claim.  Therefore, the Court will construe these three "claims" as additional allegations in support of Plaintiffs' failure to protect claim.

set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." FED. R. CIV. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Id. at 249.

## DISCUSSION

## I.      Count I: Eighth Amendment Claims

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII. The Supreme Court has held that the Eighth Amendment requires prison officials to take "reasonable measures to guarantee the safety of the inmates [and]...to protect prisoners from violence at the hands of other prisoners." Crow v. Montgomery, 403 F.3d 598, 601-02 (8th Cir. 2005) (quoting Farmer v. Brennan, 511 U.S. 825, 832-33 (1994)). As indicated previously, the Eighth Amendment's proscription against cruel and unusual punishment applies only to convicted prisoners and not pre-trial detainees. Hott, 260 F.3d at 905. The Fourteenth Amendment guarantees pre-trial detainees at least as many protections as does the Eighth Amendment, however, and extends to them as well protection from deprivations that are intended to punish. Id. (citing Bell v. Wolfish, 441 U.S. 520, 545 (1979)).

### A.      Failure to Protect

Count I of Plaintiffs' Third Amended Complaint alleges Defendants failed to protect Stevens from attack by Francis, a fellow inmate.  Defendants argue Plaintiffs' failure to protect claims must fail because, prior to the incident, Francis did not exhibit hostility or violence towards Stevens and there were no reported problems between both men.  Plaintiffs counter that there is a genuine issue of material fact as to whether Stevens was under conditions posing a substantial risk of serious harm.

"[A] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  Farmer, 511 U.S. at 828.  For the purposes of failure to protect claims, "it does not matter...whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk."  Hott, 260 F.3d at 906 (quoting Farmer, 511 U.S. at 843)).  Thus, deliberate indifference can be predicated upon knowledge of a victim's particular vulnerability (though the identity of the ultimate assailant is not known in advance of the attack), or, in the alternative, an assailant's predatory nature (though the identify of the ultimate victim is not known in advance of the attack).  Brown v. Budz, 398 F.3d 904, 915 (7th Cir. 2005).

Deliberate indifference has both an objective and a subjective component.  Hott, 260 F.3d at 906.  The objective component requires a plaintiff to demonstrate an objectively serious risk.  Id.  This objective requirement ensures that the deprivation is sufficiently serious so as to amount to a deprivation of constitutional dimension.  Jensen v. Clarke, 94 F.3d 1191, 1197 (8th Cir. 1996).  The subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such risk.  Hott, 260 F.3d at 906.  In order to demonstrate that a defendant actually knew of, but deliberately disregarded, a serious risk, the plaintiff must establish a "mental state akin to criminal recklessness."  Gordon v. Frank, 454 F.3d 858, 862 (8th Cir. 2006).  However, while a deliberate indifference claim requires the establishment of a defendant's actual, subjective knowledge,

such knowledge can be demonstrated with circumstantial evidence.  See Farmer, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge...is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.").

### 1.    Defendant City of St. Louis

Municipal liability under 42 U.S.C. § 1983 for failure to protect claims is appropriate in cases where a municipal "policy" or "custom" causes the constitutional violation.  Doe v. Washington County, 150 F.3d 920, 922 (8th Cir. 1998).

> Although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

Monell v. Dept. of Social Services of City of New York, 436 U.S. 658, 690-91 (1978).

Defendants argue Stevens suffered no constitutional violation as a result of any policy, practice, or custom attributable to Defendant City.  Plaintiffs counter that Defendant City's system of assigning breaks for correctional officers and pattern of poor communication between the nursing staff and the correctional officers are unconstitutional policies that create substantial risks of serious harm for arrestees and that these policies or customs caused  serious harm to Stevens.

Viewing the facts in the light most favorable to Plaintiffs, Defendants have not met their burden of proving that Defendant City is entitled to judgment as a matter of law.  Plaintiffs are not making generalized claims regarding institution-wide deficiencies over which supervisory jail officials had only partial control and which were not shown to have resulted in the alleged constitutional violation.  Cf. Crow v. Montgomery, 403 F.3d 598, 603 (8th Cir. 2005) (where the plaintiff suffered a broken jaw at the hands of cellmate and claimed facility was overcrowded, poorly supervised, understaffed, and improperly classifying inmates, the court "refuse[d] to hold supervisory jail officials

liable for acts that may or may not have contributed to [the plaintiff's] injury"). Rather, Plaintiffs have identified two particular policies or customs that they allege resulted in Stevens's death, and Plaintiffs have shown Defendant City officials were aware of these policies or customs. Plaintiffs assert that since there was no correctional officer on the men's side of PAH at the time of the assault, Francis was able to assault Stevens unseen and other arrestees were unable to notify anyone that the assault was occurring. Plaintiffs also assert there was a pattern of poor communication between the nursing staff that initially assessed an inmate's mental stability and the correctional officers who later supervised them in PAH. Thus, Plaintiffs have pointed to municipal policies or customs that Plaintiffs allege caused Stevens's death.

The affidavits of Defendants Harry, Hall, Bond, Harrison, and Soward that Defendants have provided in support of their Motion for Summary Judgment offer only conclusory statements asserting that the individual defendants did not know of or implement any policy to deprive Stevens of his constitutional rights. See Exhibits 1-5, 8, ECF Nos. 147-1-147-5, 147-8. These conclusory statements fail to controvert Plaintiffs' argument that there were two constitutionally deficient policies in place at the Justice Center, and these affidavits are insufficient to support the entry of summary judgment in favor of Defendant City on Plaintiffs' failure to protect claim. See Hanke v. Global Van Lines, Inc., 533 F.2d 396, 398 (8th Cir. 1976). Plaintiffs have presented evidence that the men's side of PAH was regularly without a correctional officer when the officer on duty on the men's side took his daily break. Plaintiffs have also presented evidence that the nursing staff who performed the initial mental evaluations of arrestees would not communicate their findings to the correctional officers unless an arrestee was considered suicidal or in need of close supervision. A reasonable jury could find that these policies put Stevens or any other mentally ill prisoner in his situation at substantial risk of serious harm and that these policies did in fact result in harm to Stevens.

- 14 -

As with any other failure to protect claim, an inmate must prove that the government or its officials were deliberately indifferent to a substantial risk of serious harm in order to make out a claim against a municipality for failure to prevent harm from an inmate attack. Doe, 150 F.3d at 922-23. As noted above, deliberate indifference has both an objective and a subjective component. Hott, 260 F.3d at 906. The objective component requires a plaintiff to demonstrate an objectively serious risk. Id. The subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such risk. Id.

Under the objective component of the deliberate indifference test, the Court readily finds that Stevens's death constituted "serious harm" so as to amount to a deprivation of constitutional dimension. See Jensen, 94 F.3d at 1197 (noting that assault at the hands of fellow inmates is a serious harm). Given Stevens's and Francis's obviously mentally disturbed behavior, Williams's warning to Defendant Soward that Francis would hurt Stevens, Defendant Hall's statement that Francis should have been isolated from other inmates, and Defendant City's policy of housing homeless inmates together, the Court finds that the risk that Stevens would suffer serious harm was substantial.

Under the subjective component of the deliberate indifference test, the Court finds Defendants have not shown, as a matter of law, that officials of Defendant City did not know of and did not deliberately disregard the risk that an inmate would suffer serious harm under Defendant City's system of assigning breaks and Defendant City's pattern of non-communication between nursing staff and correctional officers. Plaintiffs' Third Amended Complaint alleges that  Defendant City "knowingly instituted and/or allowed an official practice, policy and custom of failing to properly monitor and supervise the arrestees [so] as to prevent serious risks of substantial harm" and that Defendant City "knowingly instituted and/or allowed an official practice, policy and custom of failing to properly gather information regarding arrestees and/or failing to utilize said information to properly

segregate arrestees so as to prevent serious risks of substantial harm." (Complaint, ¶¶ 42(a), 43(a)). Defendants have not presented any evidence tending to show that they were not aware that their questioned policies placed inmates at substantial risk of serious harm--that is, Defendants have not presented evidence of a lack of incidents resulting from these policies or shown that they could not have been on notice that their policies were constitutionally suspect.

Therefore, the Court finds an issue of fact remains as to whether officials of Defendant City knew inmates were at a substantial risk of serious harm due to the policy of permitting one correctional officer to monitor both sides of PAH while the other officer was taking a break and whether Defendant City officials deliberately disregarded that risk. The Court also finds an issue of fact remains as to whether Defendant City officials knew mentally ill inmates were at a substantial risk of serious harm due to inadequate communication between the nursing staff and correctional officers and whether Defendant City officials deliberately disregarded that risk. Thus, Defendant City is not entitled to judgment as a matter of law on Plaintiffs' failure to protect claim.

## 2.    Supervisory Defendants Tonya Harry, Robert Bond, and Tonya Harrison[6]

---

[6]To the extent Plaintiffs' Third Amended Complaint alleges Defendants Harry, Bond, and Harrison were deliberately indifferent to Stevens's constitutional rights in a direct capacity, Plaintiffs' claims must fail. Plaintiffs acknowledge these supervisory defendants did not interact with Stevens and Francis and were not privy to communications regarding their respective conditions. Since Defendants Harry, Bond, and Harrison had no knowledge of Stevens nor Francis prior to the incident, Plaintiffs cannot show these defendants actually knew of, but

Defendants argue Plaintiffs cannot hold the supervisory defendants liable for any alleged constitutional violations since "their affidavits have established they were not responsible for any alleged violations." (Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Memo in Support"), ECF No. 137, p. 5). Plaintiffs counter that the supervisory defendants were aware that City procedures were not followed by their subordinates and that this custom of failing to follow procedures resulted in constitutionally inadequate jail conditions.

Prison supervisors cannot be held liable under § 1983 on a theory of *respondeat superior* for any constitutional violations committed by subordinate officers. Wever v. Lincoln Cty., 388 F.3d 601, 606 (8th Cir. 2004). A supervisor may be held individually liable, however,

> if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights. The plaintiff must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts. This requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation.

Id. (quoting Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996)). Thus, proof of actual knowledge of constitutional violations is not an absolute prerequisite for imposing supervisory liability. Howard v. Adkison, 887 F.2d 134, 138 (8th Cir. 1989). Reckless disregard on the part of a supervisor will suffice to impose liability. Id.

Viewing the facts in the light most favorable to Plaintiffs, Defendants have not met their burden of proving that the supervisory defendants are entitled to judgment as a matter of law. Supervisory liability under § 1983 does not depend on direct involvement in a constitutional violation. For purposes of § 1983, it is sufficient that a supervisor had notice that his or her training procedures and supervision were inadequate and likely to result in a constitutional violation. See Wever, 388

---

deliberately disregarded, any risk of harm to Stevens. Defendants Harry, Bond, and Harrison may still be liable, however, for the failure to properly supervise and train their subordinates.

F.3d 607-08 (finding that one previous suicide at jail put sheriff on notice that his training and supervision were constitutionally inadequate). Defendants' unsupported assertions that they were not responsible for any alleged violations are conclusory and insufficient to discharge their potential liability.

The remainder of the Court's deliberate indifference analysis as to the supervisory defendants is the same as the Court's deliberate indifference analysis as to Defendant City. Again, under the objective component of the deliberate indifference test, the Court readily finds that Stevens's death sufficiently constituted "serious harm" so as to amount to a deprivation of constitutional dimension. See Jensen, 94 F.3d at 1197. The Court also finds that the risk that Stevens would suffer serious harm was substantial. Under the subjective component of the deliberate indifference test, the Court finds Defendants have not shown that the supervisory defendants did not know of and did not deliberately disregard the risk that an inmate would suffer serious harm under Defendant City's system of assigning breaks and Defendant City's pattern of non-communication between nursing staff and correctional officers. As with Defendant City, Plaintiffs' Complaint alleges that the supervisory defendants "knowingly instituted and/or allowed an official practice, policy and custom of failing to properly monitor and supervise the arrestees [so] as to prevent serious risks of substantial harm" and that the supervisory defendants "knowingly instituted and/or allowed an official practice, policy and custom of failing to properly gather information regarding arrestees and/or failing to utilize said information to properly segregate arrestees so as to prevent serious risks of substantial harm." (Complaint, ¶¶ 42(a), 43(a)). Defendants have not presented any evidence tending to show that the supervisory defendants were not aware that their questioned policies placed inmates at substantial risk of serious harm. Thus, Defendants Harry, Bond, and Harrison are not entitled to judgment as a matter of law on Plaintiffs' failure to protect claim.

### 3.      Defendants Tonya Hall and Louis Soward

Again, Defendants argue Plaintiffs' failure to protect claims must fail because Francis did not

exhibit hostility or violence towards Stevens prior to the incident and because there were no reported

problems between Stevens and Francis prior to the incident, and Plaintiffs counter that there is a

genuine issue of material fact as to whether Stevens was under conditions posing a substantial risk

of serious harm.

The Court finds there is a genuine issue of material fact under the subjective component of

the deliberate indifference test as to whether Defendants Hall and Soward exhibited deliberate

indifference to an excessive risk to Stevens's safety and well-being by permitting him to remain in a

jail cell with Francis.[7]  Plaintiffs have presented evidence that Defendant Soward witnessed both

Stevens and Francis behaving in ways that suggested they were mentally ill, that Defendant Soward

was warned not to place Stevens and Francis in the same cell since Francis would hurt Stevens, that

Defendant Soward had the authority to change cell assignments, and that Defendant Soward left both

men together and unsupervised when he took his break.  Plaintiffs have also presented evidence that

Defendant Hall believed Francis should have been isolated from other inmates and that she permitted

Stevens and Francis to remain unsupervised and in the same cell while Defendant Soward took his

break.   Given these circumstances, the Court finds a genuine issue of material fact exists as to

whether Defendants Hall and Soward were deliberately indifferent to Stevens's constitutional rights.

### B.      Deliberate Indifference to Medical Needs

---

[7]Again, under the objective component of the deliberate indifference test, the Court readily finds that Stevens's death sufficiently constituted "serious harm" so as to amount to a deprivation of constitutional dimension.  See Jensen, 94 F.3d at 1197.  The Court also finds that the risk that Stevens would suffer serious harm was substantial.

Count I of Plaintiffs' Third Amended Complaint also alleges Defendants were deliberately indifferent to Stevens's known serious medical needs. Defendants argue they responded reasonably once they realized Stevens was in need of medical attention. Plaintiffs do not address Defendants' argument in their Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Memo in Opposition," ECF No. 142).

The Eighth Circuit has held that "[t]he Eighth Amendment requires prison officials to provide humane conditions of confinement, and [o]ne condition of confinement is the medical attention given to a prisoner." Aswegan v. Henry, 49 F.3d 461, 463-64 (8th Cir. 1995) (internal quotations and citations omitted). "To succeed on a claim of deprivation of medical care in violation of the Eighth Amendment, plaintiff must prove that defendants were deliberately indifferent to his serious medical needs." Moots v. Lombardi, No. 4:02CV1886, 2005 WL 4541944, at *5 (E.D. Mo. Feb. 10, 2005) (citing Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997)).

> There is both an objective and subjective component to a claim of deliberate indifference. A plaintiff must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.

Tlamka v. Serrell, 244 F.3d 628, 633 (8th Cir. 2001) (internal quotations and citation omitted). A prison official acts with the requisite deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. Mere negligence or medical malpractice is insufficient to rise to a constitutional violation. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997).

A factfinder may determine that a defendant was actually aware of a serious medical need but deliberately disregarded it "from the very fact that the [medical need] was obvious." Id. Moreover,

- 20 -

the "[i]ntentional delay in providing medical treatment shows deliberate disregard if a reasonable person would know that the inmate requires medical attention." Gordon, 454 F.3d at 862.

It is unclear from Plaintiffs' Third Amended Complaint if Plaintiffs assert the indifference to Stevens's serious medical need occurred as a result of Defendants' failure to properly treat Stevens's schizophrenia, render first aid after Stevens was discovered on the floor of his cell, or perform both actions. The Court will therefore examine both situations as grounds for Plaintiffs' deliberate indifference to serious medical need claim.

Untreated schizophrenia can in some instances constitute a serious medical need. See, e.g., Evans v. Gusman, No. 08-703, 2008 WL 2223281, at *4 n.8 (E.D. La. May 23, 2008) (citing Johnson v. Hennessey, No. C-99-04873, 2000 WL 1006537, at *2 (N.D.Cal. July 11, 2000); Mark v. Imberg, No. 05-C-279-C, 2005 WL 1587797, at *9 (W.D. Wis. July 6, 2005). Additionally, at the time that Stevens was discovered unresponsive by correctional officers on the floor of his cell, Stevens was clearly in serious medical need. Thus, regardless of which behavior Plaintiffs' Third Amended Complaint targets, the Court finds Plaintiffs demonstrated Stevens had an objectively serious medical need.

Plaintiffs have failed to show, however, that Defendants deliberately disregarded Stevens's serious medical need. With regards to Stevens's schizophrenia, Plaintiffs have not presented any evidence that any defendant willfully withheld medication or necessary treatment from Stevens. Any failure to provide Stevens with the medical care he may have been receiving prior to his arrival at the Justice Center does not rise to the level of deliberate indifference in the absence of evidence that Defendants knew of Stevens's condition and knew what care Stevens was previously receiving. See Jackson v. Meachum, 699 F.2d 578, 583 (1st Cir.1983) (noting that to "make the Eighth Amendment a guarantor of a prison inmate's prior mental health ... would go measurably beyond what today

would generally be deemed 'cruel and unusual'"). The general assertion that jail officials should have monitored a mentally ill or potentially mentally ill inmate more closely is insufficient to prove a constitutional violation. See Rice v. Correctional Medical Services, 675 F.3d 650, 684-85 (7th Cir. 2012) (although treating physician and other medical professionals could have done more to monitor mentally ill pretrial detainee's condition and could have tried sooner and more forcefully to have his schizophrenia treated involuntarily, and although a factfinder could find that treating physician breached duty of care owed to detainee by failing to do more to monitor and treat detainee's mental illness, physician's treatment decisions were not deliberately indifferent to detainee's serious medical needs); Taplet v. Brooks, 432 Fed. Appx. 697, 697-98 (9th Cir. 2011) (prison officials were not deliberately indifferent by failing to diagnose inmate with schizophrenia and prescribe appropriate treatment).

With regards to Stevens's condition at the time he was found on the floor of his cell, Plaintiffs have also failed to show Defendants deliberately disregarded Stevens's serious medical need. While Plaintiffs argue Defendants failed to administer basic first aid, the evidence shows Defendants reasonably responded to Stevens once they discovered that he was in serious medical need. Plaintiffs acknowledge that Defendant Hall went to cell 28 after other inmates informed her that an altercation was occurring between its residents, and that after observing Stevens on the floor, she called her supervisor, Defendant Harrison. It was against protocol for Defendant Hall to enter cell 28 by herself, and Defendant Hall was also unarmed. Plaintiffs acknowledge that Defendant Bond overheard Defendant Hall's call to Defendant Harrison and that Defendant Bond arrived at the male side of PAH before Defendant Harrison. When Defendant Bond arrived, he entered the cell, handcuffed Francis, and removed Francis from the cell. At that point Nurse Kases entered the cell, examined Stevens, and told Hall to call 911. Additional medical nurses at the Justice Center arrived

before emergency medical personnel.  According to the timeline offered in Plaintiffs' Statement of Material Facts, Defendant Soward left for lunch at 7:12 P.M., Defendant Hall called Defendant Harrison at 7:17 P.M., and 911 was called at 7:25 P.M.  Thus, there is no evidence that Defendants' response to Stevens's medical needs was deficient in any way, and Defendants are entitled to summary judgment on Plaintiffs' claim for deliberate indifference to serious medical need.

## II.    Count II: Wrongful Death Claims

Count II of Plaintiffs' Third Amended Complaint alleges wrongful death against the individual defendants and Defendant CMS.  Defendants argue the individual defendants did not have a duty to provide medical care to Stevens, and that Plaintiffs' wrongful death claims against the individual defendants must therefore fail.  Defendants also assert that the individual defendants appropriately respond to Stevens's need for medical attention.  Plaintiffs do not address Plaintiffs' argument, instead noting that Defendants have failed to establish that there is no issue of material fact as to whether the individual defendants had a duty to "be aware of [Stevens's] individual physical and mental health needs and provide incarceration consistent with those needs."  (Memo in Opposition, p. 14).

Under Missouri law, Plaintiffs must establish the following elements in order to succeed on wrongful death claim on a theory of negligence: (1) the defendant owed a duty of care to the decedent; (2) the defendant breached that duty; (3) the breach was the cause in fact and the proximate cause of the decedent's death; and (4) as a result of the breach, the plaintiff suffered damages.  Heffernan v. Reinhold, 73 S.W.3d 659, 665 (Mo. App. 2002).  The existence of a duty is purely a question of law.  Aaron v. Havens, 758 S.W.2d 446, 447 (Mo. banc 1988).

Viewing the facts in the light most favorable to Plaintiffs, Defendants are not entitled to judgment as a matter of law as to Plaintiffs' wrongful death claim.  Defendants offer no legal basis

for their argument that Defendants had no duty to provide medical care to Stevens.  Defendants simply assert that CMS was responsible for medical care for detainees, that there was a nurse at the scene of the altercation, and that medical attention was given to Stevens once the area was secure. This is insufficient to prove, as a matter of law, that Defendants had no duty to provide medical care to Stevens and that, assuming Defendants did have that duty, Defendants did not breach it.

Furthermore, even assuming the individual defendants established that they had no duty to provide medical care to Stevens or that they did not breach their duty, Plaintiffs' Third Amended Complaint also alleges the individual defendants had the duty to "be aware of [Stevens's] individual physical and mental health needs and provide incarceration consistent with those needs." (Complaint, ¶ 51(c)). Defendants did not address this duty in their Motion for Summary Judgment and, therefore, Defendants' Motion for Summary Judgment failed to take into account Plaintiffs' wrongful death claim arising out of this duty.  Defendants' Motion for Summary Judgment as to Count II is denied.

## III.    Punitive Damages

Defendants argue Plaintiffs cannot recover punitive damages from the individual defendants sued in their official capacities and from Defendant City.  Plaintiffs do not address Defendants' argument in their Memo in Opposition.

A municipality and local officials acting in their official capacity are immune from punitive damages under 42 U.S.C. § 1983. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981). Thus, in a civil rights case, punitive damages are only recoverable against municipal employees who are being sued in their individual capacities.  See Smith v. Wade, 461 U.S. 30, 55-56 (1983). Plaintiffs' punitive damages claims against Defendant City and the individual defendants in their official capacities are therefore dismissed, while Plaintiffs' punitive damages claims against the individual defendants in their individual capacities will remain.

## IV.    Qualified Immunity

Defendants argue they are entitled to qualified immunity.  Plaintiffs counter that Defendants have failed to carry their burden of proving qualified immunity since they did not cite any cases nor offer any discussion of facts in support of their argument.

Qualified immunity is an affirmative defense for which the defendant carries the burden of proof.  Harrington v. City of Council Bluffs, __ F.3d __, 2012 WL 1470266, at *2 (8th Cir. 2012). Defendants offer no explanation or analysis as to why they are entitled to qualified immunity in this case.  The entirety of Defendants' argument consists of a single sentence in their Motion for Summary Judgment: "Defendants submit that Plaintiff's claims should be barred by the doctrine of qualified immunity." (Defendants' Motion for Summary Judgment, ECF No. 135, ¶ 12).  Neither Defendants' Memo in Support nor Defendants' Reply to Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment (ECF No. 153) contains any reference to qualified immunity.  Defendants have failed to carry their burden of proof on this issue.  Therefore, Defendants' Motion for Summary Judgment on the grounds of qualified immunity will be denied.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants City of St. Louis, Tonya Harry, Patricia Hall, Robert Bond, Carla Harrison, and Louis Soward's Motion for Summary Judgment (ECF No. 135) is **GRANTED** in part and **DENIED** in part, in accordance with the foregoing.


Dated this   25th   day of May, 2012.


/s/Jean C. Hamilton
UNITED STATES DISTRICT JUDGE